**Kelli J. HUFF, Debtor.**

**Habbo G. Fokkena, United States Trustee, Plaintiff,**

v.

**Kelli J. Huff, Defendant.**

**Bankruptcy No. 05–05205.
Adversary No. 05–30199–wle.**

United States Bankruptcy Court,
S.D. Iowa.

Aug. 4, 2006.

Lloyd R. Bergantzel, Council Bluffs, IA for Debtor/Defendant.

James L. Snyder, Des Moines, IA, for Plaintiff.

## DECISION

WILLIAM L. EDMONDS, Bankruptcy Judge.

Habbo G. Fokkena, the United States trustee, objects to debtor's discharge. Trial was held June 29, 2006 in Council Bluffs. John F. Schmillen appeared as attorney for Fokkena. Lloyd R. Bergantzel appeared as attorney for the debtor, Kelli J. Huff. This is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

Huff is 36 years old. She is divorced and has three children. Her son is 11 years old and lives with his father. The other two children, daughters ages 10 and 5, live with Huff in Treynor, Iowa.

Huff graduated from Nishna Valley Senior High School. She attended Wayne State College in Nebraska for one year and Northwest Missouri State University for two and one-half years. She studied accounting, but did not graduate. She says she has one year left to graduate.

She has been self-employed as a medical records transcriptionist. She transcribes medical notes dictated by the doctors contracting for her services. Prior to March 2004 she had five accounts. She supplied the recording devices to the doctors; some were hand-held tape recorders, others were hand-held digital recorders.

In 1994 or 1995, Huff and her then-husband, Brent Huff, began farming her parents' farmground in Mills County, Iowa. Huff's father had had a stroke and could no longer farm the 180 acres. Kelli and Brent Huff farmed the land together through 2002, the year of their divorce.

In 2004, Huff farmed the ground with a friend, Rod Frink. They farmed the land on a 50/50 basis, dividing expenses and profit equally. Huff and Frink had a dispute over the profit. Frink threatened a lawsuit against Huff. She scheduled his claim in the amount of $25,000, and dis-

closed a suit in her statement of affairs. She is uncertain whether he filed a lawsuit.

Huff's mother, Sharon Smith, also called Anne Smith, charges cash rent by the number of farmable, tillable acres. Although the farm is 180 acres, normally only 165 are tillable, and the amount of tillable acres in any year can vary by the amount of unfarmable, wet bottom ground.

Huff was seriously injured in an automobile accident in March 2004. She incurred nearly $200,000.00 in medical bills and had no insurance. After she was injured, she had difficulty in keeping up with her transcription work. She lost all but one account.

Huff alone farmed her mother's farmground in 2005. Her mother charged her $85.00 per acre for approximately 165 acres, for a total payment of $14,025.00. They executed a lease on February 23, 2005 (exhibit 4). Huff was required to pay half of the total rent on March 1, 2005 ($7,012.50) and the remaining half after the crop had been harvested. On April 6 she paid $6,715.00 to her mother (exhibit 7). Also on February 23, 2005, Smith signed a lease of a grain bin to Huff for eight cents per bushel of stored grain. Huff did not sign the lease document, but she does not dispute it.

Huff did not farm the ground herself; she hired a custom operator named Merton Richter. Richter's work was to include planting, spraying and combining; it did not include hauling harvested crops.

In order to farm in 2005, Huff obtained a line of credit from Houghton State Bank in Red Oak, Iowa. On April 1, 2005, Huff and her mother signed a line of credit agreement and a security agreement (exhibits 9 and 8). Smith was listed as a "borrower" on the documents, not merely as an accommodation party (*id.*). The line of credit was for $25,000.00 (exhibit 9).

Advances on the line of credit were to be jointly approved by Huff and Smith (*id.*).

The first advance was on April 1, 2005 for $6,715.00 (exhibit 10). The loan proceeds were deposited in a joint account at the Houghton State Bank. Huff says that checks drawing on funds in the account required the signatures of both Huff and Smith. During 2005, loan advances were made on the following dates:

| | |
|---|---|
| April 1 | $6,715.00 |
| April 13 | 7,100.00 |
| April 18 | 2,923.00 |
| June 20 | 5,000.00 |
| July 13 | 669.00 |
| September 1 | 250.00 |
| September 6 | 1,500.00 |

(exhibit 10).

Prior to Huff's filing bankruptcy, the following checks were drawn on the account for the purposes shown:

| | | |
|---|---|---|
| April 6 | Anne Smith | 1st half cash rent |
| April 7 | Pioneer | corn and bean seed |
| April 18 | Farm Service Co. | anhydrous ammonia |
| June 17 | Anne Smith | 2nd half cash rent |
| July 12 | Farm Bureau | insurance |

(exhibit 14). Each of the checks was signed by Huff and Smith. Smith had possession of the checkbook, and according to Huff, Smith handled the "business side" of Huff's farming operation. I infer that to mean the "paperwork side," as Huff testified she herself made purchasing and sales decisions, selected the crops, and applied for government programs. Huff said she signed blank checks for her mother to use to pay bills.

Huff repaired her motor vehicle after the accident in 2004. She had a subsequent accident; the vehicle was a total loss. Her mother bought a new pickup truck in June 2005 and provided it to Huff for her use. Smith obtained a loan to purchase the pickup truck, and she makes the loan payments. On June 25, 2005, Huff and Smith signed an "addendum to the original farm contract" which provided that "proceeds from the farm" would be used to make Smith's annual payment of $7,479.51 on the vehicle (exhibit 6).

Huff filed her chapter 7 petition on July 14, 2005. By that time her crops of corn and beans were growing. Nothing in Huff's schedules indicated her 2005 farming operation. Her schedule of real property showed only her home in Hastings, Iowa. Her schedule of personal property listed only household goods valued at $2,565.00. She claimed the homestead and the household goods as exempt. She also claimed as exempt $1,000.00 in unpaid wages and tax refunds. However neither was listed on her schedule of personalty.

In her schedule of creditors holding secured claims, Huff listed the mortgagee on the homestead and her former husband who had obtained a lien against the home in the couple's dissolution proceeding. Among her unsecured debts, she listed Rodney Frink's claim from the 2004 crop year. Nowhere did the schedules show any assets or debts related to the 2005 farming operation. She did not list the unexpired leases on the land or the pickup. She did not list any debt to Houghton State Bank. She did not list her mother as a co-debtor to the bank. She did not list growing crops as an asset. She did not list the joint farm bank account. In her schedule of monthly expenses, she did not list expenses from the operation of a business, profession or farm. The only reference to farming was the disclosure in the statement of affairs that she had earned $23,000.00 from farming in 2004.

The meeting of creditors in Huff's case was held August 24, 2005. Attending the meeting besides Huff were her attorney Lloyd Bergantzel, Deborah Petersen the trustee, Brent Huff, her former husband, and Rodney Frink.

Deborah Petersen, the trustee, examined Huff. Huff said she received paperwork from her attorney regarding the bankruptcy information and that she filled it out. She confirmed that she reviewed the finished forms before she signed them and that they were true and correct. She testified that she listed all her assets and debts. The trustee began asking Huff whether she had specific assets. She responded that she owned a watch, clothing, and a camera. Petersen asked if Huff had any office supplies or furnishings for her business. Huff said she had digital recorder(s), a laptop computer, phones, and supplies. She estimated the value of the business items at $5,500.00. That was the amount paid for the items approximately two years before. Huff said she had no bank accounts. On examination by the attorney for her former husband, Huff testified she had bank accounts with her children, and that the accounts belonged to her children.

Petersen asked if Huff had any crops or farm equipment. Huff said she had crops—70 acres of corn and 80 acres of beans. She explained that she cash-rented the land from her mother and hired a custom operator, Merton Richter, to farm it. Huff said no one had a lien against the crops. She also disclosed that she had paid half of the rent on the land, that she had paid for the seed and for the custom planting. The trustee asked Huff to amend her schedules to show the unlisted assets. The trustee also informed Huff that the crops were not exempt and that the money made on the crops would be used to pay creditors.

On September 20, 2005, Huff filed a motion to dismiss her case. The trustee objected. Huff testified that she filed the motion because she had obtained a new transcription contract with a medical group in Des Moines, and she believed she was getting back on her feet—that she "could do it." The motion was denied on October 12, 2005.

On October 18, 2005, Huff filed amended schedules (exhibit 2). She listed her

clothes, watch, and camera. She listed a computer and eight digital recorders used in her transcription business. Huff also scheduled the growing crops of corn and beans; she showed them at an "unknown" value. Huff claimed the clothes, computer and recorders as exempt.

On her schedules of debts, Huff added her mother to the creditors holding secured claims. She scheduled the debt at $19,500.00. She also added Houghton State Bank on the crop loan and showed the amount of the claim as $25,000.00. Also, Huff listed Sharon Smith on amended schedule G regarding the leased farmground.

By the time Huff amended her schedules, she had harvested all the beans. In a letter by her attorney, attached to the amended schedules, it was disclosed to the trustee that Huff had sold 2,039 bushels of beans and had received $10,363.79. She had also sold 1,000 bushels of beans at $5.42 per bushel for December delivery. She sold 500 bushels of beans at $5.59 also for December delivery. The latter two sales grossed $8,215.00. Huff also obtained a Loan Deficiency Payment from the Commodity Credit Corporation based on 7,500 bushels of the corn crop. The payment was $3,750.00. She turned it over to the trustee. She also turned over to the trustee farm program payments she received on October 11, 12 and 14.

Out of the cash bean sales, Huff paid for trucking and also paid Houghton State Bank on the secured crop loan. The beans harvested for December delivery were stored in the bins leased from Smith.

In the letter dated October 11, Huff's lawyer informed Petersen that Huff still owed the following debts: Smith for the balance due on the cash rent; Houghton State Bank for the balance of the crop loan; Farm Bureau in the amount of $888.00 for "revenue assurance" and

$669.00 for hail insurance; and the custom operator for combining in the amount of $1,936.00 (exhibit 2, pp. 8–10).

Bergantzel said that Huff would take no further steps regarding the crops until Petersen made a decision regarding her position on the crops (*id.*).

Notwithstanding the information in the attorney's letter attachment, the check register from the farm account (exhibit 7) shows a July 12 payment to Farm Bureau for $669.00 and a September 6 payment to Richter for $6,511.17. I cannot determine from the evidence whether the balances shown in Bergantzel's letter are correct in light of the post-petition payments from the joint farm bank account. Grain proceeds checks net of all expenses totaled $26,248.94 (exhibit 15).

At trial, Huff had explanations for some, but not all, of the omissions from her schedules. She said she forgot about the recorders used in her transcription business. In September 2005, she obtained a job as a medical records transcriptionist with a group of orthopedic doctors in Des Moines. She supplies them with digital recorders. Huff says the tape recorders she had previously used in the business are obsolete and at the time she filed bankruptcy, were not being used. After her first accident, she stored them in her basement. When she filed bankruptcy, she had forgotten about them.

Huff testified that she did not schedule the joint bank account because her mother had the checkbook and handled the business aspects of the farming operation. She said the bank statements went to her mother.

As to her failure to list the crop in her bankruptcy schedules, she explained that she did not know if there would be a crop, that a farmer does not have a crop until it is in the truck or the bin. This is so

because of risks to the crop until it is harvested. She said she would not have known what value to place on the crop until it was harvested. Conversely, she said she did not think of it.

She said also that she did not think of her loan from the Houghton State Bank. She testified that she kept farm matters separate, and that the banking matters were handled by her mother. As to the bank's lien on the crop, she said she did not list the bank as secured because she did not believe it had a lien; at trial she still did not think so. She said a farmer borrows money from a bank and agrees to pay it back. She explained, "I get money from the crop and I pay the bank; it's not a lien; it's a loan."

Huff testified that she spent her own time and money in an effort to get the crop harvested and sold in order to pay the trustee. She said that it was she who obtained the Loan Deficiency Payment, which would not have otherwise been obtained by the trustee.

Petersen, the trustee, testified that she did not ask for Huff's help with the harvest and sale of the crops. Petersen said she had conversations with Smith, and they agreed that Smith would arrange for harvest and hauling. Smith also made arrangements for crop proceeds to go to the Houghton State Bank to be held for the trustee's administration. Petersen testified that she had trouble getting information from Huff's attorney. She said she had no direct contact with Huff. Petersen said she advised Bergantzel that all of the crops were property of the estate and that Huff was not to receive or dispose of the proceeds of the sales of the crops.

## Discussion

The trustee contends that Huff's discharge should be denied because she gave false information under oath on her schedules of assets and debts. Huff responds that the omissions in her schedules were not knowing and fraudulent. Moreover, Huff says that when asked by the trustee at the meeting of creditors about the existence of property, she immediately reported owning the assets in question, including the crop, transcription equipment, and her personal items. She reinforces the absence of fraud by pointing out that after the crop had matured, she expended her time and efforts to turn the crop into money and to obtain government payments for the bankruptcy estate.

■■■ Debtor shall be granted a discharge unless, "the debtor knowingly and fraudulently, in ... the case—made a false oath." 11 U.S.C. § 727(a)(4)(A). Huff's bankruptcy schedules were signed under penalty of perjury. The schedules, as such, are "written declarations which have the force and effect of oaths." *Jordan v. Bren (In re Bren),* 303 B.R. 610, 613 (8th Cir. BAP 2004), *rev'd in part on other grounds,* 122 Fed.Appx. 285 (8th Cir.2005). To bar discharge, the false statement must be material. *Mertz v. Rott,* 955 F.2d 596, 598 (8th Cir.1992). The subject matter is material if it relates to the debtor's business transactions or estate, or if the subject matter concerns the debtor's assets or business operations. *Palatine National Bank of Palatine, Illinois v. Olson (In re Olson),* 916 F.2d 481, 484 (8th Cir.1990). "Deliberate omissions by the debtor may ... result in the denial of a discharge." *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 618 (11th Cir.1984). The objector need not show detriment to creditors, nor does it matter whether or not the debtor intended to injure his or her creditors. *Id.* It is necessary only that debtor told an intentional untruth in a matter material to the case. *See Aronofsky v. Bostian,* 133 F.2d 290, 292 (8th Cir. 1943)(an Act case).

■ Full disclosure is a prerequisite to the debtor's obtaining a discharge. *American State Bank v. Montgomery (In re Montgomery)*, 86 B.R. 948, 956 (Bankr. N.D.Ind.1988). To a great extent, the system depends on debtors voluntarily telling the truth. There are insufficient resources in the bankruptcy system to check every schedule for accuracy or to complete an inventory of every debtor's assets.

■■ The burden of proof is on the objecting party. *Korte v. United States (In re Korte)*, 262 B.R. 464, 471 (8th Cir. BAP 2001); Fed.R.Bankr.P. 4005. The objector must prove each element of the objection by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ The United States trustee has met his burden on each element. Huff's discharge should be denied.

The omissions from Huff's schedules were many. The more significant omissions from the schedule of personal property involved Huff's business assets. Most significant was Huff's failure to disclose any assets related to her farming operation—her farm lease with her mother, her growing crops, the lease of the new pickup truck, and the farm bank account. As to debts, the schedules omitted the identification as creditors of Huff's mother and the Houghton State Bank. Huff's amended schedules list the bank as having a claim of $25,000.00 and her mother as having a claim for $19,500.00.

With regard to her medical transcription business, Huff failed to list her laptop computer and the recorders. Although the failure to list the obsolete recorders might be understandable, the failure to list the laptop is not. Huff was engaged in transcription at the time she filed. She showed her occupation as a medical transcriptionist on her schedule I, and listed her monthly income as $700.00. It is difficult to believe she merely forgot about the laptop, as she appears to have been using it regularly at the time of filing.

The omission of the farm assets and liabilities and of the laptop were material. Huff's verified schedules were false. The false statements were material because they related to significant assets, liabilities, and business transactions.

Huff knew that her listing of assets and liabilities was false. She made the false statements with fraudulent intent.

Her most significant asset and main source of income was the crop. She explained that she did not think about the crop as an asset because she was unable to place a value on it until it was harvested, and until harvested, she did not know if there would be a crop. Huff's professed, personal inability to estimate the value of the crops in the field is no excuse for failing to list her interest in the crop, even with a zero value. The schedule itself directs a debtor to list "crops, growing or harvested" (exhibit 1, Schedule B–30).

■ Fraudulent intent may be established by circumstantial evidence. *In re Korte*, 262 B.R. at 474. The number and significance of omissions from the schedules, and the fact that they all involved Huff's farming operation support an inference of fraudulent intent.

Huff explains the omission by saying the crop had no value until harvested, but that does not explain her omission of the bank and her mother as creditors. She knew she owed them money. Indeed, they were two of her largest creditors. Moreover, her explanation of the omission of the crop (which I do not find credible) does not explain the failure to list the lease of the land and the lease of the pickup truck. Huff's failure to list any information with regard to the 2005 farming operation is

significant evidence of fraudulent intent. The omissions go beyond the schedules of assets and debts. On her Schedules I and J, Huff failed to identify herself as a farmer. Even if she considered she had no current income from farming, she failed to list regular expenses from farming on Schedule J.

Huff contends that when the trustee inquired about assets at the meeting of creditors, she reported the crops right away. But Huff did not volunteer omitted assets at the outset without questioning by the trustee. The trustee had to run down a list of assets to obtain the information. Also, I view Huff's admissions at the meeting of creditors not as an indication of honest intent, but rather as an unavoidable result of two knowledgeable creditors being present at the meeting—her former husband and Frink, the man she farmed with in 2004. Both knew of her past farming activities. It is not unlikely they knew of her 2005 farming. In my view, their presence at the meeting detracts from her contention that she was forthcoming with information to the trustee.

Huff's discharge will be denied under 11 U.S.C. § 727(a)(4)(A). I do not reach the U.S. trustee's allegations under 11 U.S.C. § 727(a)(2).

IT IS ORDERED that judgment shall enter that the discharge of Kelli J. Huff is denied under 11 U.S.C. § 727(a)(4)(A).